IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| LEONARD CATALANO, | ) | |
| | ) | |
| Petitioner, | ) | NO. 3:06-00681 |
| | ) | JUDGE HAYNES |
| | ) | |
| | ) | |
| RICKY BELL, Warden, | ) | |
| | ) | |
| Respondent. | ) | |

## MEMORANDUM

Petitioner, Leonard Catalano, filed this action under 28 U.S.C. § 2254 seeking to set aside his state convictions for three aggravated sexual batteries upon three young girls for which Petitioner received a sentence of 32 years. After a review of the petition, the Court appointed the Federal Public Defender to represent Petitioner. In his amended petition, the Petitioner asserts the following claims: (1) that his trial counsel was ineffective for failure to move to suppress Petitioner's statement to a detective and to challenge his sentence enhancements; (2) that the trial court's sentencing violated his due process right by ignoring mitigating evidence; and (3) that his sentence was entered in violation of his Sixth Amendment rights. Later, Petitioner conceded that some of his claims are procedurally defaulted and now limits his petition to three claims: (1) ineffective assistance for failure to investigate and present witnesses at sentencing; (2) trial counsel's failure to interview Petitioner's adult daughters as potential witnesses at his sentencing hearing; and (3) ineffective assistance in advising Petitioner on his guilty plea.

### A. Procedural History

Petitioner was indicted on 18 counts of aggravated sexual battery, but entered a guilty plea to three of these counts for which be received a sentenced of 32 years. On direct

appeal of his sentence, the Tennessee Court of Criminal Appeals affirmed his sentence. State v. Catalano, No. M2001-03039-CCA-R3-CD, 2003 WL 21877933 (Tenn. Ct. Crim. App. July 9, 2003). The Tennessee Supreme Court denied his application to appeal. Id. Petitioner did not seek review in the United States Supreme Court.

On August 24, 2004, Petitioner filed a state post-conviction petition with ineffective assistance of counsel claims that his plea was not knowingly and voluntary entered and his counsel's inadequate performance at his sentencing. After a hearing, the trial court denied the petition and on appeal, the Tennessee Court of Criminal Appeals affirmed. Catalano v. State, No. M2005-00070WL-CCA-R3-PC , 2006 WL 12770 (Tenn. Ct. Crim. App., filed Jan. 3, 2006). The Tennessee Supreme Court denied his application to appeal on January 31, 2005. Id. . Petitioner did not seek review in the United States Supreme Court.

## B. Review of the State Record[1]

The Tennessee Court of Criminal Appeals summarized the proof at Petitioner's guilty plea and sentencing hearings:

> A Davidson County grand jury indicted the defendant on eighteen counts of aggravated sexual battery. Without an agreement regarding sentencing, the defendant pled guilty to counts one, nine, and thirteen, each involving a different victim. At the conclusion of a sentencing hearing, the trial court sentenced the defendant to twelve years on count one, ten years on count nine, and ten years on count thirteen. The trial court also set these terms to run consecutively resulting in an effective thirty-two-year sentence. Through this appeal the defendant asserts that his sentences should not have been ordered to be served consecutively and that his sentences should not have been set above the minimum in his range. After considering the record and relevant authorities, we find that these issues lack merit and/or have been waived; thus, we affirm the effective sentence imposed by the trial court.

---

[1] State appellate court opinion findings constitute factual findings in an action under 28 U.S.C. § 2254. Sumner v. Mata, 449 U.S. 539, 546-47 (1981).

2

Within the analysis of the issues, we will address additional factual detail as is necessary. However, in summary the record reflects that this case involves the defendant's molestation of three young girls: his daughter, his "step-granddaughter," and one of his daughter's close friends. At the time of the offenses, the defendant had been divorced from the mother of the aforementioned daughter for an extended period but had not pursued active visitation with this daughter until she was approximately four years old. Because the victim was reluctant to spend time with the defendant, another child typically joined her and her father on "sleep-overs." **The defendant admitted that with this access to the victims, he had touched all three of the victims' vaginal areas with his hand. Furthermore, the defendant acknowledged oral vaginal contact with his daughter and step-granddaughter. Incidents such as these allegedly occurred during the period covering the fall of 1999 to the fall of 2000 in situations during which the defendant was serving as the girls' caretaker. According to their dates of birth, the victims would have ranged in age from four to six years old during that time.**

\* \* \*

The record reflects that the trial court found all four of the considerations in section 40-35-115(b) argue in favor of consecutive sentencing with respect to the convictions involving the defendant's daughter and step-granddaughter. While it is unclear whether the trial court applied the fourth factor to the conviction involving the daughter's close friend, the court did find the first three appropriate for use in the friend's case also.

In beginning our review, we first address the trial court's application of the consecutive sentencing aggravating circumstance regarding the defendant's relationship with the victims. As noted previously, **the defendant is the biological father of one of the victims**, to whom we will refer as M. **He became the grandfather of T. by marriage**, and though he was divorced from T.'s grandmother at the time of the offenses, **a custodial relationship had once and still existed between the defendant and T. Finally, the defendant was not related in any manner to K., M.'s close friend; however, the record reflects that the defendant fulfilled a supervisory role with K. as she spent the night with him and his daughter.** We further note that K. had been staying at M.'s house in a daycare situation run by the defendant's ex-wife since K. was three months old, and she and others allegedly referred to the defendant as "Pa Pa Lenny." Under these circumstances **we find that the custodial relationship between the defendant and victims supports the imposition of consecutive sentences in this case.**

We next turn to consideration of the length of time during which the acts

3

continued undetected. **Since the victims were all quite young, we do not have exact dates for individual acts. However, according to M. she was four years old when the "bad touches" began and six years old when they ended, thus, indicating that the abuse had persisted for a period of time in excess of one year.** Adding insight regarding her daughter's and K's presence with the defendant during this period, T.'s mother testified that T. had been at the "sleep-overs" with M. almost every other Saturday and that T. was present if K. was not.FN4 Furthermore, the **defendant acknowledged multiple incidents of molestation involving all three victims, and through his "Comprehensive Psychosexual Evaluation" he gave his version of the timing involved with two of these girls, admitting that his behavior with [M. and T.] had "involved increasingly inappropriate and close sexual contact" over a two-month period of time.**

> FN4. This witness added that T.'s attitude toward these visits had changed at some point along the way. Though T. would not tell her mother why, T. no longer wanted to stay with M. when the defendant spent the night. Nevertheless, T. apparently did so with her mother's encouragement. One of the more heartbreaking aspects of this case arises out of this situation. T.'s mother explained that she had thought that the girls might be somewhat afraid of the defendant because he was loud and not as gentle as their mothers. This witness wondered at the time if the defendant simply did not "know how to handle the girls when they were silly [and] rowdy." Thus, she told T., "Just try to be good. Just do what he says and he won't yell at you. Please go [T.M.] really needs you."

**This Court has previously affirmed a trial court's finding that the "time span" consideration for consecutive sentencing in sex abuse cases was appropriately applied wherein sexual abuse essentially took place over one summer.** See Harold Lynn Woodroof, 1999 WL 820872, at *5. In that instance the lower court had noted that "[t]he summer of a young child, ten or twelve years old, is a long period of time." Id. **Our victims in this case were only around five years of age. In keeping with this rationale and additional case law, we find that the trial court was also justified in using "the time span of defendant's undetected sexual activity" to support consecutive sentencing.**

Furthermore, **we find that "the extent of the residual ... mental damage to" two of the three victims also weighs in favor of consecutive sentencing here. M.'s mother testified that before reporting the abuse, M. had begun kindergarten at the Montessori School in Brentwood. However, by October of the school year, M. began begging her mother to stay with her and not take her to school. M. would not play with the other children, and ultimately**

4

even her teachers suggested that M. withdraw from school for a while. Though in first grade at the time of sentencing, M. was still being home-schooled out of necessity. Additionally, M. had great difficulty sleeping at night. While she had previously slept in her own bed, M. continued refusing to sleep alone at the time of the sentencing hearing. She also had difficulty eating and had to be taken to the doctor for this problem. M. and T.'s counselor of approximately ten months added that M. had endured daily stomach aches with no known physical explanation. This witness further testified that M. had bad dreams and that T. did also, though T.s' nightmares seemed more vivid. In addition, the counselor stated that T. had begun engaging in aggressive behaviors toward other children and T.'s mother. T.'s mother elaborated on her daughter's problems arising after the abuse. For example, she recounted that **T. missed at least one day of school a week during the 1999-2000 school year because T. "was throwing up."** She also stated that T. awoke from a nightmare at least once weekly. Through her victim impact statement T.'s mother noted that T. had started acting out in the months before the abuse was discovered but would not tell them what was upsetting her.

The counselor also indicated that the defendant's relationship with these two girls greatly complicates their recovery. At the time of sentencing both of these victims were said to still be asking the counselor why these things had happened, and M. worried that she (M.) was somehow responsible or should have prevented the abuse from taking place. Furthermore, **the counselor testified that M. and T. would not only struggle with regaining the capacity to trust after this considerable betrayal but also experience problems misinterpreting affection as having a sexual connotation and sexual behavior as an expression of simple affection. And beyond the impact of the defendant's relationship to the girls, the counselor indicated that the duration and variety of the abuse inflicted on the victims were significant concerns in their recovery.** This witness stated that she could not speculate on how much longer M. and T. would need counseling. Such combined evidence weighs in favor of consecutive sentencing.

Finally, it appears that **the "nature and scope" of the defendant's "sexual acts" with these girls involved sexual games as well as direct sexual acts. These games include mock beatings, masturbation, voyeurism, and exhibitionism.** Under the record presented, we find that the sentence was not handed down as a matter of routine and that **the cumulative sentence, while substantial, is in keeping with the severity of the crimes perpetrated upon these three young girls left in the defendant's care.** Thus, since the defendant has failed to meet his burden of demonstrating the impropriety of his sentence, this issue merits no relief.

5

> Since the defendant in this case faced sentencing as a standard offender on B felonies, the appropriate sentencing range encompassed eight to twelve years. See id. § 40-35-112(a)(2). As noted above, the trial court sentenced the defendant to twelve years on the conviction involving his daughter and to ten years each for the remaining convictions. In enhancing all three sentences, the trial court applied and afforded great weight to enhancement factor (15), regarding the abuse of a position of private trust. See id. § 40-35-114(15) (Supp. 2001). Facts noted in the previous issue reveal that the record supports the trial court's use of this factor. Additionally, the trial court found factor (6), regarding the infliction of particularly great personal injuries upon the victims, applicable to the counts involving M. and T. See id. § 40-35-114(6) (Supp.2001). Because of the above-described psychological injuries, we agree that this factor was also properly applied.

Catalano, 2003 WL 21877933 at * * 1, 2-4, 5 (emphasis added and some citations omitted).

In his post-conviction appeal, the Tennessee Court of Criminal Appeals summarized the proof on Petitioner's post-conviction claims as follows:

> **The post-conviction court held a hearing on the petition on November 19, 2004. At the hearing, the petitioner testified that prior to the guilty plea hearing trial counsel failed to keep him apprised of the status of his case. The petitioner stated that he was scared and did not know what to say or do about his case. The petitioner claimed that trial counsel told him if he went to trial he could end up with a thirty-two-year sentence, but that if he pled guilty, he might get a lesser sentence.**
>
> **The petitioner also claimed that trial counsel did not discuss discovery with him.** The petitioner stated that he visited trial counsel's office on several occasions and while there, listened to audio tapes of conversations between him and police officers, but that trial counsel would be doing something else rather than listening to the tapes. Further, the petitioner claims that trial counsel told him "you're wasting my options." The petitioner was also disappointed that trial counsel never tried to suppress his statements to the police.
>
> The petitioner testified that trial counsel failed to contact any of the character witnesses that he provided and claimed that he would have rather gone to trial.
>
> On cross-examination, the petitioner admitted that at the time he made his first statement to the police, he was not under arrest and actually allowed the police

officer to come into his home. Further, the petitioner admitted that he told the police that he touched the private parts of two of the victims, but contended that he was "pressed" into saying it. However, the petitioner admitted that he gave a similar account of the events during his mental health interview.

The petitioner also admitted that trial counsel told him his chances at trial were poor, due to his tape-recorded statements to the police. However, the petitioner continued to assert that trial counsel gave him little choice about going to trial or pleading guilty.

James Mulholland testified that the petitioner was his hair stylist and cut his hair for approximately ten years. Mr. Mulholland stated that he liked the petitioner and admired the way that the petitioner cared for his elderly father.

Lieutenant David Imhof of the Metropolitan Nashville Police Department testified that during the investigation of the victims' allegations, he went to the petitioner's home to interview him. Upon his arrival, Lt. Imhof informed the petitioner that he was not under arrest, but that he wanted to talk to him about an incident concerning his daughter. Lt. Imhof informed the petitioner that he did not have to talk and could end the conversation at any time. The petitioner consented to the conversation and gave a statement essentially admitting the crimes. The petitioner was arrested the following day.

Trial counsel testified that he had been an attorney since 1983 and had practiced criminal law since 1993. Trial counsel remembered that the petitioner came to see him at his office. **According to trial counsel, the two met four or five times at his office and four additional times either at jail or in court. Trial counsel obtained discovery materials from the State, reviewed the petitioner's statements, researched case law and came to the conclusion that a motion to suppress would be fruitless.**

**Trial counsel informed the petitioner that due to the taped statements, a trial was unadvisable, especially in light of the interviews of the victims conducted by psychologists at Our Kids Center. Trial counsel informed the petitioner that he would be better off pleading to three counts of aggravated sexual battery, with a possible sentence of thirty-six years, rather than going to trial on all eighteen counts.**

**Trial counsel informed the post-conviction court that his standard practice in plea arrangements was to read each and every portion of the plea agreement aloud to his client, in anticipation that he would have to testify about the review of the agreement at a subsequent post-conviction hearing. Trial counsel remembered following his standard practice with the petitioner,**

7

going over every detail of the plea agreement prior to the plea hearing.

Trial counsel stated that after the plea hearing, the petitioner provided him with a list of character witnesses for the sentencing hearing. Trial counsel testified that he had difficulty in locating the people on the list, even sending his paralegal to the jail on two occasions to get additional information from the petitioner about the witnesses. Trial counsel remembered that a number of witnesses were the petitioner's clients, who could not offer much more than to say that the petitioner was a good hair stylist. Trial counsel considered using the petitioner's pastor as a witness, even issuing a subpoena for her to testify at the sentencing hearing, but during conversations with her prior to the hearing, trial counsel determined that the pastor was hedging on her testimony and, therefore, chose not to call her as a witness. Trial counsel also stated that he contacted the petitioner's older daughter about testifying, but that she refused, stating that the petitioner had also molested her as a young child.

At the conclusion of the hearing, the post-conviction court took the matter under advisement. In a written order, the post-conviction court denied the petition, determining that the petitioner failed to satisfy his burden to establish a basis for post-conviction relief. Specifically, the post-conviction court found:

> The petitioner first argues that trial counsel failed to inform the petitioner of the nature and consequences of the plea and failed to adequately meet with him to discuss the case. [Trial counsel] testified that he met with the petitioner eight to nine times. Four to five of these were at his office, others were at court and once at the jail before the sentencing hearing. [Trial counsel] testified that he discussed the nature of the charges for which the petitioner was facing and what his options were. The options were a possible plea with a recommended sentence, an open plea with a sentencing hearing, or a trial. The petitioner testified that [trial counsel] did go over the discovery with him as well as the taped statements that he had made. The petitioner states that he was "scared out of my mind." However, the petitioner offered no proof at the hearing as to why this was. The Court accredits the testimony of [trial counsel] and therefore finds that this issue is without merit.

The petitioner next argues that trial counsel misrepresented his experience with criminal cases. The petitioner testified that he had heard that [trial counsel] practiced in real estate. [Trial counsel] testified that he practiced from 1983-1993 at a firm and handled banking and real estate law. [Trial counsel] further testified that he started his own practice in 1993 and that from that time his primary

8

practice was criminal defense. [Trial counsel] testified that he had represented others who were charged with child sex crimes. The Court finds that [trial counsel] did not misrepresent his experience in criminal cases to the petitioner. Therefore, the Court finds that this issue is without merit.

The petitioner next argues that trial counsel failed to file a Motion to Suppress the statements made to Detective David Imhoff. The petitioner, [trial counsel] and Detective Imhoff all testified that the petitioner was not in custody at the time of the incriminating statement given at the defendant's residence. Detective Imhoff testified that at this taped interview, he told the petitioner that he was not under arrest, that he did not have to answer any questions if he did not want to and that he could stop at an time. The petitioner then made incriminating statements to Detective Imhoff. The next day, the petitioner was arrested. At this time, Detective Imhoff read the petitioner his Miranda rights. [Trial counsel] and the petitioner testified that they received an audio copy of the statements and that they listened to them. [Trial counsel] testified that after researching Tennessee and federal cases on Westlaw, he was not able to find a basis in which to file a Motion to Suppress the statements made by the petitioner.... The Court accredits the testimony of [trial counsel] and finds that this issue is without merit.

The petitioner next argues that trial counsel was ineffective by failing to properly and adequately develop and investigate possible defenses.... [Trial counsel] testified that during his meetings with the petitioner he discussed possible defenses with the petitioner. After listening to the tapes [sic] statements and reviewing the discovery, [trial counsel] determined that there were no defenses. The Court finds that the defendant has offered no proof as to what any further investigation would had [sic] yielded and therefore, cannot meet the prejudice prong of the analysis in Strickland v. Washington, 466 U.S. at 687-697.

**The petitioner next argues that trial counsel was ineffective by failing to interview the state's witnesses and the petitioner's witnesses. [Trial counsel] testified that he felt he would not be not be [sic] successful in attempting to interview the victims in the case. The petitioner testified that he gave [trial counsel] a list of character witnesses who could potentially testify for the petitioner at the sentencing hearing. [Trial counsel] testified that he attempted to contact these witnesses, but many of the addresses and phone numbers were no longer good. [Trial counsel] further testified that those witnesses he was able to interview would not be favorable to the petitioner. Therefore, no witnesses testified on behalf of the petitioner. The Court accredits the testimony of [trial counsel] and therefore finds that this issue is without merit.**

The petitioner next argues that trial counsel was ineffective by failing to attack the

9

sentences imposed as a violation of Apprendi v. New Jersey. Specifically, the petitioner argues that the petitioner's Sixth Amendment right to a jury trial was violated when the sentences were enhanced and ordered to run consecutively. **The Tennessee statutory scheme was not directly in issue when the Apprendi decisions were rendered. Absent language to the contrary, the principles set forth in Apprendi are not to be applied retroactively thus not immediately operating to invalidate any sentence, including the petitioner's sentence. Furthermore, under Tenn.Code Ann. § 40-35-114, the Court can consider and place weight upon "abuse of private trust" as an enhancement factor. The petitioner has admitted to being the natural father of one of the victims and the step-grandfather of one of the other victims. Therefore, the Court did not consider facts other than those admitted by the defendant. The Court can and did place great weight on this factor and did not sentence the petitioner above the maximum sentence.... Under Tenn.Code Ann. § 40-35-115, the Court may order multiple offenses to run consecutively if by a preponderance of the evidence if "the defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims."** The Court considered this statute and found that the factors weighed in favor of running the sentences consecutively. As the Court sentenced the petitioner as allowed by statutory law, counsel was not ineffective for failing to attack the sentences. Therefore, the Court finds that this issue is without merit.

Catalano, 2006 WL 12770 at **2-5.

The Court notes that at the state post-conviction, trial counsel's testimony about his contact with the Petitioner's daughters on sentencing was as follows:

> Q. Were there other character witnesses, who you decided would not be helpful to your client?
>
> A. Well, he - - he asked me to talk to his daughter - - or daughters; I don't remember whether he asked me to talk to - - to both the adult daughters or just one of them - - and I did talk to her.
>
> And I - - I asked her if she would come to court, for the purpose of being a character witness for her father and - - and standing up for him as being a good father and - - and acting in the way that he should act, in - - in her - - in her raising, upbringing.

10

And she said, no that she wouldn't, because he had done the same sorts of things with her.

Q. Okay. Meaning that he had sexually abused her - -

A. Yes.

(Docket Entry No. 17-13 at pp. 78-84).

After the state evidentiary hearing, both of Catalano's adult daughters executed affidavits that state: (1) they did *not* speak to Petitioner's trial counsel at any time before the sentencing hearing; (2) they went to the sentencing hearing without any prior contact with Petitioner's trial counsel; (3) at that hearing, Allison approached and spoke very briefly to Rachel Arias to ask if she were Rachel Arias and if she wanted to testify; (4) Rachel Arias declined to testify without giving a reason and without engaging in any discussion; and (5) they were *not* sexually abused by Catalano, and neither daughter told Petitioner's trial counsel that they were sexually abused. (Docket Entry No. 21-1 & 21-2, Technical Record, Exhibits A and B).

### C. Evidentiary Hearing on Petitioner's Federal Claims

Petitioner requested an evidentiary hearing on Petitioner's trial counsel's failure to contact Petitioner's adult daughters' about testifying at Petitioner's sentencing hearing. Both of Petitioner's daughters testified that Petitioner's counsel did not ask them to testify at Petitioner's sentencing hearing. If called, the daughters would have testified that Petitioner had been a good father and neither had experienced nor observed any sexual misconduct to which Petitioner pled guilty. Petitioner's ex-wife also testified that she would have similarly testified, if she had been contacted and called as a witness at Petitioner's sentencing. Petitioner, however, did not testify that he wanted his daughters called as witnesses at his sentencing hearing.

11

Petitioner's trial counsel is deceased, but Petitioner's post-conviction counsel testified that he attempted to call the witnesses whom Petitioner identified as favorable witnesses for his sentencing hearing, but post-conviction counsel was unable to locate all of those witnesses. In October 2006, and again in early April 2007, Joe Ravenall, an investigator for the Office of the Federal Public Defender, attempted to contact the persons whom Petitioner identified as friends or coworkers who could testify at his sentencing hearing. Of those eleven, Ravenell contacted six persons.

### B. Conclusions of Law

This action is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Lindh v. Murphy, 521 U.S. 320, 336 (1997). Under the AEDPA, federal courts may not grant habeas relief for claims adjudicated on their merits in a state court proceeding, unless that state court proceeding:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d).

In Williams v. Taylor, 529 U.S. 362, 413 (2000), the Supreme Court stated that a state court judgment is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court on a set of materially indistinguishable facts." In such instances, the Supreme Court held that a federal habeas court may grant a writ.

12

Id. The Supreme Court interpreted the language "clearly established Federal law, as determined by the Supreme Court of the United States" as referring to "holdings as opposed to dicta" of its decisions at the time of the state court decision. Id. at 412. Moreover, the relevant analysis is "to apply a rule of law that was clearly established at the time the Petitioner's state court conviction became final." Id. at 390; accord Joshua v. DeWitt, 341 F.3d 430, 436 (6th Cir. 2003). In Bell v. Cone, 535 U.S. 685, 693 (2002), the Court reiterated that AEDPA modified a federal court's role in reviewing state prisoner applications "in order to prevent federal habeas 'retrials' and to ensure that state court convictions are given effect to the extent possible under the law."

Under the "unreasonable application" clause, the Supreme Court stated that a state court judgment results in an "unreasonable application" of clearly established federal law "if the state court correctly identifies the governing legal principle from [the Supreme Court's] decision but unreasonably applies [that principle] to the facts of the particular case." Id. at 694. The district court "must presume that all determinations of factual issues made by the state court are correct unless the defendant can rebut that presumption by clear and convincing evidence." Mitchell v. Mason, 325 F.3d 732, 737-38 (6th Cir. 2003) (citing 28 U.S.C. § 2254(e)(1)).

### 1. Petitioner's Ineffective Assistance of Counsel Claims

As to his claims about his trial counsel, the Tennessee Court of Criminal Appeals addressed each one of those claims and relied on the two-prong analysis set forth in Strickland v. Washington, 466 U.S. 668 (1984) and found that Petitioner's guilty plea was knowing and voluntary with effective assistance of his counsel. Catalano, 2006 WL 12770, at **6-8. The court considered that Petitioner failed to prove that but for any omission of counsel, Petitioner would have gone to trial. Id. at *8.

13

As to his trial counsel's failure to advise Petitioner on his guilty plea, the State appellate court found that:

> The transcript from the plea hearing herein reveals that the trial court carefully and correctly informed the petitioner regarding his constitutional rights, and specifically asked if he understood that he was waiving those rights by pleading guilty. The petitioner responded in the affirmative. Further, he stated that he understood the plea agreement and the significance of the guilty plea hearing, and was entering his guilty plea voluntarily. The petitioner also acknowledged that he was satisfied with counsel's representation. Accordingly, we determine that the petitioner's guilty plea was knowing and voluntary.
>
> * * *
>
> The petitioner claims that trial counsel was ineffective because he failed to effectively communicate with the petitioner. Specifically, the petitioner contends that trial counsel "did not fully interview and investigate [the petitioner's] witnesses," and did not "fully explain what was going on in the case to [the petitioner] which resulted unknowing and involuntary guilty plea" because the petitioner was unable to "fully evaluate potential trial/settlement options." We have already determined that the petitioner's guilty plea was knowing and voluntary. . . The post-conviction court accepted as true the testimony of trial counsel concerning the circumstances of the plea and the conversations leading up to that decision, including the fact that trial counsel met with the petitioner and discussed not only the discovery materials, but the plea offer and the ramifications of pleading guilty. The record not only supports the determination of the post-conviction court, but the petitioner has also failed to establish that he suffered any prejudice as a result of trial counsel's representation and failed to show that there was a reasonable probability that but for trial counsel's errors he would not have pleaded guilty and would have gone to trial. This issue is without merit.

Catalano, 2006 WL 12770, at *8. This Court concludes that the Tennessee courts' ruling on this claim as presented is reasonable.

Petitioner seeks to add a new claim that his counsel was ineffective for failing to advise the petitioner regarding the sexual gratification element of the offense to which he pleaded guilty. Petitioner fails to show that he ever presented this issue for consideration by the state courts. This

14

claim was not even included in the petitioner's original petition for writ of habeas corpus or in his amended petition. (Doc. 1; Doc. 10). Having failed to exhaust his state court remedies by presenting this argument to the state courts, the claim is barred from this Court's consideration under 28 U.S.C. § 2254(b)(I)(A).

As to Petitioner's trial counsel's failure at Petitioner's sentencing to call favorable character witnesses, the state courts found:

> **Trial counsel stated that after the plea hearing, the petitioner provided him with a list of character witnesses for the sentencing hearing. Trial counsel testified that he had difficulty in locating the people on the list, even sending his paralegal to the jail on two occasions to get additional information from the petitioner about the witnesses. Trial counsel remembered that a number of witnesses were the petitioner's clients, who could not offer much more than to say that the petitioner was a good hair stylist. Trial counsel considered using the petitioner's pastor as a witness, even issuing a subpoena for her to testify at the sentencing hearing, but during conversations with her prior to the hearing, trial counsel determined that the pastor was hedging on her testimony and, therefore, chose not to call her as a witness. Trial counsel also stated that he contacted the petitioner's older daughter about testifying, but that she refused, stating that the petitioner had also molested her as a young child.**

Catalano, 2006 WL 12770, at *3.

Under Strickland, assuming Petitioner's proof is true and that Petitioner's trial counsel should have called them as witnesses at his sentencing, Petitioner must also prove prejudice. Prejudice is shown when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. Petitioner's proof must be sufficient to establish "[a] reasonable probability [that] is a probability sufficient to undermine confidence in the outcome." Id.

Considering the testimony of the Petitioner's daughters and ex-wife, given the state

15

courts' findings on the offenses that occurred with young girls who were 4 to 5 years of age, and the grossly repetitive nature of Petitioner's conduct with them, the Court concludes that in all probability, the daughters' and ex-wife's testimony would not have altered the trial court's decision. The state courts considered also the custodial-trust relationship between the defendant and victims as well as the "great personal injuries upon the victims" Catalano, 2003 WL 21877933, at *5, to warrant Petitioner's consecutive sentences.

Petitioner contends a difference in sentence of 6 to 21 months can show prejudice under Strickland, citing Glover v. United States, 531 U.S. 198, 203 (2001) ("Authority does not suggest that a minimal amount of additional time in prison cannot constitute prejudice. Quite to the contrary, our jurisprudence suggests that any amount of actual jail time has Sixth Amendment significance."). Petitioner asserts that if the sentencing judge had not found Petitioner eligible for consecutive sentencing, then his maximum sentence would have been 12 years. Petitioner asserts that his sentence would have been at least 20 years shorter had he prevailed on the consecutive-sentencing issue, citing State v. Hayes, 899 S.W.2d 175 (Tenn. Crim. App. 1995) and State v. Powers, 2002 Tenn. Crim. App. LEXIS 889 (Tern. Crim. App. Oct. 23, 2002). Unlike the defendant in Hayes, Petitioner abused his victims, including his daughter, for more than a year. The more factually comparable state sentencing decisions are cited by the Tennessee appellate court. Catalano, 2003 WL 21877933 at **4, 5.

Petitioner's next claim is that his sentence was in violation of Blakely v. Washington, 542 U.S. 296 (2004), because the sentencing judge imposed on a consecutive sentence relying on his findings of fact at sentencing. Based on quote language, the custodial relationship between Petitioner and the victims was in the State's case-in-chief on his plea as well as the time period of

16

the Petitioner's misconduct. The only other fact finding by the judge could be the psychological injuries suffered by the young victims. In any event, <u>Blakely</u> was decided after Petitioner's conviction was final in November 2003. Petitioner raised this issue on appeal, but the Tennessee Court cited <u>State v. Gomez</u>, 163 S.W.3d 632 (Tenn. 2005), as holding that Tennessee's determinate sentencing was permissible under <u>Blakely</u>. Respondent correctly cites <u>Cunningham v. California</u>, 127 S. Ct. 856 (2007), upholding California's determinate sentencing system which is indistinguishable from the Tennessee's system under which Petitioner was sentenced.

For the above stated reasons, the Court concludes that the petition for the writ of habeas corpus should be denied.

An appropriate Order is filed herewith.
Entered this the 1st day of September, 2009.

William J. Haynes, Jr.
United States District Judge